Hon. Jamal N. Whitehead

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

**TERESA KELLY and ROCHELLE GARCIA, for themselves, as private attorneys general, and/or on behalf of all others similarly situated,**

Plaintiffs,

v.

**ASHLEY STEWART, INC., KINBOW LLC, G ASHLEY INC., SAMARTH GUPTA, and SARIKA GUPTA,**

Defendants.

Case No. 2:25-cv-02094-JNW

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CONSUMER PROTECTION ACT, RCW 19.86, AND THE COMMERCIAL ELECTRONIC MAIL ACT, RCW 19.190**

JURY DEMAND



HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8628; FAX: 425.412.7171
www.hattislaw.com

Plaintiffs Teresa Kelly ("Ms. Kelly") and Rochelle Garcia (collectively, "Plaintiffs"), allege as follows, on personal knowledge and/or upon the investigation of their counsel, against Ashley Stewart, Inc., Kinbow LLC, G Ashley Inc., Samarth Gupta, and Sarika Gupta (collectively, "Defendants"):

## INTRODUCTION AND SUMMARY

1. This is a class action against Defendants for false or misleading email marketing in violation of the Washington Consumer Protection Act ("CPA"), RCW 19.86, and the Washington Commercial Electronic Mail Act, ("CEMA"), RCW 19.190.

2. Defendants Ashley Stewart, Inc., Kinbow LLC, and G Ashley Inc. have each done business under the moniker Ashley Stewart, and are collectively referred to herein as "Ashley Stewart." Ashley Stewart is a retail brand of American plus-size women's clothing that it designs, markets, and sells. Almost all the items offered for sale by Ashley Stewart on its website www.ashleystewart.com and in its retail stores, and advertised in its email marketing, are branded as "Ashley Stewart" products and are offered and sold exclusively by Ashley Stewart.

3. For years, Ashley Stewart has engaged in a massive and consistent false discount advertising scheme across its website, in its retail stores, and in its marketing emails. Specifically, Ashley Stewart advertises perpetual or near-perpetual discounts—typically 40% to 70% off—on all its products. These discounts are taken from Ashley Stewart's inflated and self-created list prices for its products. Ashley Stewart's advertised discounts are viewed both under the law and by reasonable consumers to refer to discounts from Ashley Stewart's own regular offering prices for the products. However, Ashley Stewart's advertised discounts are false because Ashley Stewart never or almost never offers or sells the products at their list price.

4. Ashley Stewart also falsely advertises "free" offers such as "Buy 1 Get 1 Free" or "BOGO Free" where Ashley Stewart represents that it will include one more of a given item (or of a specified similar item) for "free" if the consumer pays the list price for the item. Ashley Stewart's advertised "free" offers are viewed both under the law and by reasonable consumers to

mean that the consumer is getting the "free" item(s) at no cost in conjunction with the purchase of the first item at no more than that first item's regular price. However, because the item is "discounted" by up to 75% off the list price at all other times, this means Ashley Stewart is directly recovering all of the cost, or even more than the cost, of the "free" item(s) by increasing the price of the first item, such that the free offer is illusory, and the consumer is not getting any deal at all.

5. Ashley Stewart also falsely advertises that the purported savings are for a limited time and indicates that its products will return to the full price after the sale ends, when in fact the advertised savings are perpetual and never-ending.

6. An important part of Ashley Stewart's false discount and false "free" offer advertising scheme is to send a constant stream of marketing emails to consumers that prominently advertise these false discounts and "free" offers in the subject line. Many of the consumers who receive these emails with deceptive email subject lines are Washington residents.

7. For example, Ashley Stewart sends emails with subject lines that advertise false discounts at a specified purported percentage off (e.g., "**50% off DRESSES**"). The stated discounts in the subject lines are materially false or misleading because, in reality, the discounts are being calculated from inflated and fictitious list prices at which Ashley Stewart has never or almost never offered its products for sale.

8. Ashley Stewart also sends emails with subject lines that advertise false "free" offers (e.g., "**LAST DAY TO CLAIM YOUR FREEBIE! Buy 1 Dress, Get 1 FREE!**"). The subject lines are materially false or misleading because, in reality, the "free" items are not actually free; Ashley Stewart directly recovers all of the cost, or even more than the cost, of the "free" item(s) by increasing the price of the first item to the inflated—and otherwise never charged—list price.

9. The subject lines of the emails are also materially false or misleading because they advertise that the purported savings are for a limited time and indicate that the products will

return to the full price after the sale ends (e.g. "**Final Hours! 50% off SITEWIDE ends tonight**"), when in fact the advertised savings are perpetual and never-ending.

10. The Washington Supreme Court held that CEMA "prohibits sending Washington residents commercial e-mails that contain ***any*** false or misleading information in the subject lines of such e-mails." *Brown v. Old Navy, LLC*, 567 P.3d 38, 47 (Wash. 2025) (emphasis in original). This includes false or misleading information about promotions, sales events, or discounts. **"CEMA protects consumers by requiring that commercial e-mails communicate honestly about the terms of a given promotion or sale in the subject line."** *Id*. "A violation of CEMA's e-mail regulations is a per se violation of the Consumer Protection Act (CPA)." *Id.* at *2.

11. Plaintiffs Kelly and Garcia bring this lawsuit individually and on behalf of a class of consumers residing in Washington who also received emails from Ashley Stewart sent from September 23, 2021 onward which contained false or misleading discount advertising in the subject line. Plaintiffs' requested relief includes an injunction to end the unlawful practices alleged herein. Plaintiffs also request an award to themselves and to each class member of $500 in statutory damages for each and every violative email received, and an award of attorneys' fees and costs.

## THE PARTIES

12. Plaintiff Teresa Kelly is a citizen and resident of the city of Federal Way, in King County, Washington. Ms. Kelly has been receiving Ashley Stewart's promotional emails while residing in Washington since at least 2020, and she received all of the violative emails described herein that Ashley Stewart sent from at least 2020 through October 15, 2025. After the filing of the original Complaint in this action, Ms. Kelly stopped receiving Ashley Stewart emails.

13. Plaintiff Rochelle Garcia is a citizen and resident of the city of University Place, in Pierce County, Washington. Ms. Garcia has been receiving Ashley Stewart's promotional emails while residing in Washington since at least August 23, 2025, and she received all of the

violative emails described herein that Ashley Stewart sent from at least August 23, 2025 through the present day.

14. Defendant Ashley Stewart, Inc. is a Delaware corporation headquartered at 150 Meadowlands Parkway, Secaucus, New Jersey 07094. Ashley Stewart, Inc. owned and operated the Ashley Stewart brand, including its website and retails stores. Ashley Stewart is an American plus-size women's clothing company and lifestyle brand. Almost all the items offered for sale by Ashley Stewart on its website www.ashleystewart.com and in its retail stores, and advertised in its email marketing, are branded as "Ashley Stewart" products and are offered and sold exclusively by Ashley Stewart. Ashley Stewart maintains an online shopping website, www.ashleystewart.com, where customers can purchase products and ship them to anywhere in the United States, including Washington State. Ashley Stewart also has 74 stores across the United States, but none are in Washington State. Ashley Stewart, Inc. ran all elements of its email marketing campaign until Ashley Stewart, Inc. was sold to Kinbow and then G. Ashley. Now, it is merely a shell.

15. Defendant Kinbow LLC is a limited liability company that was formed on March 6, 2024. Kinbow LLC is headquartered at 732 S 6th Street, Suite R, Las Vegas, Nevada 89101. On April 1, 2024, Kinbow LLC acquired the majority stake of Defendant Ashley Stewart, Inc. from its then parent company, ASI Holdco LLC. As the majority stakeholder, Kinbow LLC has owned and operated the Ashley Stewart brand, including its website and retail stores.[1] Based on information and belief, Kinbow LLC directed or assisted the marketing operations of the Ashley Stewart brand and the perpetration of the unlawful actions described herein—including the creation and sending of the violative emails. Kinbow LLC is managed exclusively by a three-person Board of Managers consisting of Defendant Samarth Gupta; his wife, Defendant Sarika Gupta; and Ram Ajjarapu. Kinbow LLC owned and operated Ashley Stewart, Inc. as the

[1] *See* Kinbow LLC press release regarding its acquisition of Ashley Stewart at https://www.businesswire.com/news/home/20240401495482/en/Kinbow-Acquires-Majority-Stake-in-Ashley-Stewart-Inc.-Expanding-Its-Commitment-to-Retail.

majority stakeholder until Defendant G Ashley purchased Ashley Stewart, Inc. via an Article 9 sale, which closed on November 26, 2025.

16. Defendant G Ashley Inc. ("G Ashley") is a company formed by Defendants Samarth Gupta and Sarika Gupta on November 10, 2025. G Ashley is a Delaware corporation headquartered at 150 Meadowlands Parkway, Suite 403, Secaucus, New Jersey, 07094. G Ashley's Chief Executive Officer is Defendant Samarth Gupta. G Ashley's Chief Financial Officer is Defendant Sarika Gupta. On November 26, 2025, G Ashley purchased all rights, title, and interests in, and substantially all assets of, Ashley Stewart, Inc. Since November 26, 2025, G Ashley has owned and operated the Ashley Stewart brand, including its website and retail stores. As the majority owner of Ashley Stewart, Inc., G Ashley now oversees, directs and assists the marketing operations of the Ashley Stewart brand and the perpetration of the unlawful actions described herein—including the creation and sending of the violative emails. G Ashley has taken over all retail stores, retained all employees (including critical employees), and now runs the Ashley Stewart website. G Ashley has also taken over and been responsible for all Ashley Stewart emails since November 20, 2025.

17. Defendants Samarth Gupta and Sarika Gupta (collectively, "the Guptas") are the sole directors of G Ashley. The Guptas managed Kinbow LLC as two of the three Corporate Managers on the Board of Managers. The Guptas thus oversaw the Ashley Stewart brand throughout Kinbow LLC's ownership of Ashley Stewart, Inc. Sarika Gupta served—and still serves—as the Chief Financial Officer of Ashley Stewart, Inc. After forming G Ashley, the Guptas purchased substantially all of the assets of Ashley Stewart, Inc., on November 26, 2025.[2] G Ashley and the Guptas continue to oversee, direct, and assist the marketing operations of the Ashley Stewart brand and therefore, along with Defendants Ashley Stewart, Inc., Kinbow LLC,

---

[2] The Guptas contested an alleged reconstitution of a prior Board of Directors of Kinbow LLC that included additional directors of Kinbow LLC who filed for Chapter 11 bankruptcy on behalf of Ashley Stewart, Inc. The Guptas' challenge of the Chapter 11 bankruptcy case was effective and the Court denied the bankruptcy filing on December 29, 2025.

and G Ashley, the Guptas are responsible for the unlawful actions described herein—including the creation and sending of the violative emails.

18. Ashley Stewart, Inc., Kinbow LLC, G Ashley, Samarth Gupta, and Sarika Gupta are referred to as "Defendants" in this Complaint.

## JURISDICTION AND VENUE

19. **Subject Matter Jurisdiction.** The Washington State court in which Ms. Stewart originally filed her claims had, and still has, proper jurisdiction over this matter under Section 6 of Article IV of the Washington State Constitution (Superior Court jurisdiction, generally), RCW 19.86.090 (Superior Court jurisdiction over Consumer Protection Act claims), and RCW 19.190.090 (Superior Court jurisdiction over Commercial Electronic Mail Act claims). Defendants Ashley Stewart, Inc. and Kinbow LLC removed this action to this Court. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy, exclusive of interest and costs, exceeds $5,000,000, and this is a proposed class action in which there are members of the proposed Class who are citizens of a state different from a Defendant.

20. **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because, without limitation, (1) Defendants have transacted and continue to transact business within the State of Washington and/or (2) Defendants have committed tortious acts within the State of Washington and/or have committed tortious acts outside the State of Washington which had an impact within the State of Washington, including sending the violative emails to consumers in Washington State. In addition, Defendants intended, knew, or are chargeable with the knowledge that their out-of-state actions would have a consequence within Washington State. The Guptas, along with G Ashley, have continued to oversee the sale of goods and transmission of the violative emails to consumers in Washington State. Further, the Guptas (who are the directors of G Ashley) had knowledge and oversight responsibility for the violative emails sent to Washington State consumers prior to G Ashley's purchase of Ashley Stewart, Inc. as two


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

members of the Kinbow LLC board while Kinbow LLC owned the majority of Ashley Stewart, Inc. prior to the sale of Ashley Stewart, Inc. to G Ashley. Defendants have sufficient minimum contacts with Washington State to render the exercise of jurisdiction by this Court permissible.

21. With regard to the cause of action brought pursuant to the Washington Consumer Protection Act, this Court has personal jurisdiction over Defendants pursuant to RCW 19.86.160. For example, and without limitation, Defendants have engaged and continue to engage in conduct in violation of RCW 19.86 which has had and continues to have an impact in Washington State which said chapter reprehends.

22. **Venue.** Venue is proper pursuant to 28 U.S.C. § 1391 because both Plaintiffs are Washington citizens who reside in this District. Plaintiffs also received the violative emails sent by Defendants while residing in this District. Moreover, Defendants have transacted business in this District; including, without limitation, by: (a) sending the violative marketing emails alleged herein to Washington citizens who reside in this District; (b) conducting substantial online and in-person retail sales and business with Washington citizens who reside in this District; and (c) shipping clothing and other consumer goods to Washington citizens who reside in this District.

23. **Intradistrict Assignment.** The Seattle Division is the proper division under LCR 3(e). Plaintiff Kelly resides in King County, which is a part of the Seattle Division. Also, a substantial part of the events or omissions giving rise to the claim occurred in the Seattle Division, including, without limitation, Plaintiff Kelly received and viewed the violative emails sent by Defendants from King County.

## FACTUAL ALLEGATIONS

24. Ashley Stewart is a designer, marketer, and retail seller of American plus-size women's clothing and accessories. Almost all the items offered for sale by Ashley Stewart on its website www.ashleystewart.com, in its retail stores, and advertised in its email marketing, are branded as "Ashley Stewart" products and are offered and sold exclusively by Ashley Stewart.


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

25. Defendants own and operate, and/or have owned and operated, the Ashley Stewart brand, including the Ashley Stewart website, retail stores, and marketing operations.

26. The Ashley Stewart website is accessible from Washington State and consumers in Washington State can view the contents of, and purchase goods from, the Ashley Stewart website. Ashley Stewart sends marketing emails to consumers throughout the country, including thousands of consumers in Washington State.

27. Kinbow LLC was formed on March 6, 2024 with the Board of Directors including Defendant Samarth Gupta, Defendant Sarika Gupta, and Ram Ajjarapu. On April 1, 2024, Kinbow LLC acquired the majority stake of Defendant Ashley Stewart, Inc. from Ashley Stewart, Inc.'s parent company, ASI Holdco LLC. Kinbow LLC owned and operated Ashley Stewart, Inc. as the majority stakeholder until G Ashley purchased Ashley Stewart, Inc. via an Article 9 sale, which closed on November 26, 2025.

28. On November 26, 2025, G Ashley (managed and directed by the Guptas) closed on their purchase of the assets of Ashley Stewart, Inc.[3]

29. G Ashley's purchase of Ashley Stewart, Inc. and assumption of its obligations thus ensured the continuation of the Ashley Stewart retail enterprise. Prior to November 26, 2025, Defendants Kinbow LLC, Samarth Gupta, and Sarika Gupta owned and operated Ashley Stewart, Inc. After November 26, 2025, Defendants Samarth Gupta and Sarika Gupta owned and operated G Ashley, and thus Ashley Stewart, Inc. The Guptas therefore continue to own substantially all of Ashley Stewart, Inc. and its assets, and maintain control over it. G Ashley appears to have been incorporated for the purpose of purchasing Ashley Stewart, Inc. Since G Ashley's purchase of Ashley Stewart, Inc., Ashley Stewart has continued the uninterrupted operation of its normal business practices, exactly as it did before.

[3] In December 2025, Ashley Stewart filed for Chapter 11 bankruptcy, which was contested by the Guptas as a fraudulent attempt to void the prior sale of Ashley Stewart, Inc.'s assets to G Ashley and improper for lacking approval from either of the Guptas, who remained on the Kinbow LLC Board of Managers. The Guptas' challenge was successful and the Court denied the bankruptcy filing on December 29, 2025 for lack of approval from the corporate Managers of Kinbow LLC.

30. After the purchase of Ashley Stewart, Inc. by G Ashley in November 2025, the Ashley Stewart website was updated to list the corporate office as:

G Ashley
Ashley Stewart
150 Meadowlands Parkway, Suite 403
Secaucus, NJ 07094
USA

31. Upon information and belief, Ashley Stewart continues to maintain the same employees, management, and shareholders as it had before the sale to G Ashley, continues the same products and/or type of products, maintains continuity of assets and general business operations, and holds itself out as the same corporation as it was before the sale of its assets to G Ashley.

32. The Guptas direct G Ashley and Ashley Stewart, and as of December 29, 2025, were still two out of three Managers of the Board of Managers of Kinbow LLC. The Guptas have control over G Ashley as its Directors and thus now control Ashley Stewart. The Guptas, as Managers of Kinbow LLC, a Defendant in this lawsuit as originally filed, have had notice of this lawsuit since it was originally filed. Yet, since the Guptas assumed ownership through G Ashley in November 2025, Ashley Stewart has continued to send or cause to be sent violative emails to Washington Consumers, continuing to cause the harms alleged in this lawsuit.

### A. <u>Background Information: Ashley Stewart's Advertised Discounts Are False.</u>

33. For years, Ashley Stewart has engaged in a massive and consistent false discount advertising scheme both on its website and in its retail stores. Specifically, Ashley Stewart advertises perpetual or near-perpetual discounts—typically 40% to 70% off—on all of its products. These discounts are taken from Ashley Stewart's advertised list prices for its products. Ashley Stewart's advertised discounts are viewed both under the law and by reasonable consumers to refer to discounts from Ashley Stewart's own regular offering prices for its

products. However, Ashley Stewart's advertised discounts are false. Ashley Stewart never or almost never offers or sells its products at their list price in on its website or in its retail stores.

34. Ashley Stewart also advertises "free" offers such as "Buy 1 Get 1 Free" or "BOGO Free" where Ashley Stewart represents that it will include one more of a given item (or of a specified similar item) for "free" if the consumer pays the list price for the item. Ashley Stewart's advertised "free" offers are viewed both under the law and by reasonable consumers to mean that the consumer is getting the "free" item(s) at no cost in conjunction with the purchase of the first item at no more than that first item's regular price. However, because the item is "discounted" by up to 75% off the list price at all other times, this means Ashley Stewart is directly recovering all of the cost, or even more than the cost, of the "free" item(s) by increasing the price of the first item, such that the free offer is illusory, and the consumer is not getting any deal at all.

35. Ashley Stewart also falsely advertises that the purported savings are for a limited time and indicates that its products will return to the full price after the sale ends, when in fact the advertised savings are perpetual and never-ending.

36. Plaintiffs' allegations concerning Ashley Stewart's false discount advertising are based in part on Plaintiffs' counsel's investigation of the Ashley Stewart website using counsel's proprietary web scraping software, and also on counsel's investigation of archived Ashley Stewart webpages on the Internet Archive's Wayback Machine (available at www.archive.org).[4]

37. Plaintiffs' counsel has been monitoring and scraping the Ashley Stewart website on an automated daily basis with a proprietary software program since June 28, 2025. Counsel has compiled and extracted daily pricing and marketing data from the website for most of the products Ashley Stewart has offered on its website during this time. In total, counsel has

[4] The Internet Archive is an internet library that archives webpages. For more information: https://archive.org/about/.

assembled and analyzed a historical database of daily prices and time-stamped screenshots of over 263,000 daily offerings of approximately 3,650 products during this time.

38. Plaintiffs' counsel also examined over a hundred randomly selected screenshots of the Ashley Stewart website from the Internet Archive's Wayback Machine, going back to 2021. In every single screenshot that counsel examined, almost every product was displayed with a discount from an advertised reference price. Based on this investigation, counsel determined that Ashley Stewart's false discount advertising scheme has been ongoing since at least 2021.

39. Plaintiffs' counsel has also investigated and reviewed years of marketing emails sent by Ashley Stewart to its customers. The perpetual percentage-off discounts and "free" offers which Ashley Stewart advertised, and continues to advertise, in the subject lines of its marketing emails are consistent with the false discounts and pricing on the Ashley Stewart website.

40. Counsel's investigation and data shows that Ashley Stewart advertises perpetual discounts for nearly all of its products, typically ranging from 40% to 70% off.

41. The stated percentage-off discounts are almost always false, and Ashley Stewart's list prices to which the discounts are applied are false and inflated. In fact, for every single product that Ashley Stewart advertises with a discount, Ashley Stewart has almost never offered the product at the reference price without a discount.

42. Ashley Stewart's false discount advertising is so pervasive across all of its products and in all of its advertising and promotional emails that it is apparent that the heart of Ashley Stewart's marketing plan is to deceive the public.

43. Counsel's investigation into Ashley Stewarts's false discount advertising scheme is as thorough as possible under the circumstances. Thus, Plaintiffs' allegations which are based on information and belief are permissible. "Without an opportunity to conduct any discovery, [Plaintiffs] cannot reasonably be expected to have detailed personal knowledge of [Ashley Stewarts's] internal pricing policies or procedures." *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 564, 568 (9th Cir. 2017). "Because [Plaintiffs] need not specifically plead facts to


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

which [Plaintiffs] cannot 'reasonably be expected to have access,' [Plaintiffs'] allegations regarding the fictitious nature of the [reference] prices may properly be based on personal information and belief at [the pleading] stage of the litigation." *Id.* Here, Plaintiffs' allegations are based not only on information and belief, but also on a comprehensive investigation of Ashley Stewarts's historical advertising which was as thorough as possible under the circumstances.

44. Ashley Stewart perpetrates this false discount advertising scheme in its advertising emails because it works—lying about discounts increases demand and increases Ashley Stewart's revenues and profits.

45. Decades of academic research has established that the use of discount advertising like that utilized by Ashley Stewart materially impacts consumers' behavior by affecting the consumer's perception of the value of the transaction, the consumer's willingness to make the purchase, and the amount of money the consumer is willing to pay for the product.[5]

---

[5] *See*, *e.g.*, Richard Staelin, Joel E. Urbany & Donald Ngwe, *Competition and the Regulation of Fictitious Pricing*, 87 J. of Mktg. 826 (2023); Mark Armstrong & Yongmin Chen, *Discount Pricing*, 58 Econ. Inquiry 1614 (2020); Rajesh Chandrashekaran & Dhruv Grewal, *Assimilation of Advertised Reference Prices: The Moderating Role of Involvement*, 79 J. Retailing 53 (2003); Pilsik Choi & Keith S. Coulter, *It's Not All Relative: The Effects of Mental and Physical Positioning of Comparative Prices on Absolute Versus Relative Discount Assessment*, 88 J. Retailing 512 (2012); Larry D. Compeau & Dhruv Grewal, *Comparative Price Advertising: An Integrative Review,* 17 J. Pub. Pol'y & Mktg. 257 (1998); Larry D. Compeau, Dhruv Grewal & Rajesh Chandrashekaran, *Comparative Price Advertising: Believe It or Not*, 36 J. Consumer Aff. 284 (2002); David Friedman, *Reconsidering Fictitious Pricing*, 100 Minn. L. Rev. 921 (2016); Dhruv Grewal & Larry D. Compeau, *Consumer Responses to Price and its Contextual Information Cues: A Synthesis of Past Research, a Conceptual Framework, and Avenues for Further Research*, in 3 Rev. of Mktg. Res. 109 (Naresh K. Malhotra ed., 2007); Daniel J. Howard & Roger A. Kerin, *Broadening the Scope of Reference Price Advertising Research: A Field Study of Consumer Shopping Involvement*, 70 J. Mktg. 185 (2006); Aradhna Krishna, Richard Briesch, Donald R. Lehmann & Hong Yuan, *A Meta-Analysis of the Impact of Price Presentation on Perceived Savings*, 78 J. Retailing 101 (2002); Balaji C. Krishnan, Sujay Dutta & Subhash Jha, *Effectiveness of Exaggerated Advertised Reference Prices: The Role of Decision Time Pressure*, 89 J. Retailing 105 (2013); Gorkan Ahmetoglu, Adrian Furnham, & Patrick Fagan, *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behavior*, 21 J. of Retailing & Consumer Servs. 696 (2014); Bruce L. Alford & Abhijit Biswas,

*Footnote continued on next page*



HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

46. Consumers who are presented with discounts are substantially more likely to make the purchase. "Nearly all consumers (94%) search for a deal or offer when shopping online," "81% of [consumers] say finding a great offer or discount is on their mind throughout the entire purchase journey," and "two-thirds of consumers have made a purchase they weren't originally planning to make solely based on finding a coupon or discount." RetailMeNot Survey: Deals and Promotional Offers Drive Incremental Purchases Online, Especially Among Millennial Buyers, PR Newswire (Apr. 25, 2018, at 08:06 ET), https://www.prnewswire.com/news-releases/retailmenot-survey-deals-and-promotional-offers-drive-incremental-purchases-online-especially-among-millennial-buyers-300635775.html.

47. The Ninth Circuit has also acknowledged and explained how false discount advertising materially affects consumer behavior: "Most consumers have, at some point, purchased merchandise that was marketed as being 'on sale' because the proffered discount seemed too good to pass up. Retailers, well aware of consumers' susceptibility to a bargain, therefore have an incentive to lie to their customers by falsely claiming that their products have previously sold at a far higher 'original' price in order to induce customers to purchase merchandise at a purportedly marked-down 'sale' price." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1101 (9th Cir. 2013).

### B. **CEMA Prohibits Sending Washington Residents Commercial Emails With False Or Misleading Subject Lines.**

48. Washington's Commercial Electronic Mail Act (CEMA) regulates deceptive email marketing.

49. CEMA prohibits a person from initiating or conspiring to initiate the transmission to an email address that the sender knows, or has reason to know, is held by a Washington State

---

*The Effects of Discount Level, Price Consciousness and Sale Proneness on Consumers' Price Perception and Behavioral Intention*, 55 J. Bus. Res. 775 (2002); and Tridib Mazumdar, S. P. Raj & Indrahit Sinha, *Reference Price Research: Review and Propositions*, 69 J. Mktg. 84 (2005).


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

resident of a commercial email that contains false or misleading information in the email's subject line. RCW 19.190.020(1)(b).

50. The Washington Supreme Court confirmed that CEMA "prohibits sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails." *Brown v. Old Navy, LLC*, 567 P.3d 38, 47 (Wash. 2025) (emphasis in original). This includes false or misleading information about promotions, sales, or other pricing information. **"CEMA protects consumers by requiring that commercial e-mails communicate honestly about the terms of a given promotion or sale in the subject line."** *Id.*

51. "CEMA was enacted to protect concrete interests in being free from deceptive commercial e-mails. CEMA's prohibition on sending commercial e-mails with false or misleading subject lines . . . creates a substantive right to be free from deceptive commercial e-mails." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1011 (W.D. Wash. Nov. 27, 2019) (holding that the plaintiff sufficiently pleaded a concrete injury-in-fact for alleged CEMA violations based on her receipt of marketing emails from defendant containing allegedly false "xx% off" statements in the subject line).

52. An injury occurs any time a commercial email is transmitted that contains false or misleading information in the subject line. *Harbers,* 415 F. Supp. 3d at 1011. Under CEMA, it is irrelevant whether the misleading commercial emails were solicited. *Id.*

53. "A violation of CEMA's e-mail regulations is a per se violation of the Consumer Protection Act (CPA)." *Brown*, 567 P.3d at 42.

54. Generally, a plaintiff pleading a claim under the CPA must plead five necessary elements: (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that affects the public interest, (4) injury to plaintiff's business and property, and (5) causation. *Wright v. Lyft, Inc.*, 406 P.3d 1149, 1153 (Wash. 2017) (citation omitted). However, because a violation of CEMA is a per se violation of the CPA, all five elements are satisfied as a matter of law. *Id.* at 1151; *see also Brow*n, 567 P.3d at 42.


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

55. “Under CEMA, the injury is receiving an e-mail that violates its regulations.” *Brown*, 567 P.3d at 42. Accordingly, “CEMA does not require a showing of injury for statutory damages to be awarded because the injury is receiving the e-mail that violates CEMA.” *Id.* at 45; *see also Wright*, 406 P.3d at 1154 (“[CEMA] does not condition the award of damages on proving either injury or causation. In fact, damages for CEMA violations are *automatic*.” (emphasis in original)).

56. A person is entitled to $500 statutory damages “anytime a prohibited message is transmitted.” *Harbers*, 415 F. Supp. 3d at 1009; *see also In re Classmates.com Consol. Litig.*, No. C09-45RAJ, 2011 WL 744664, at *7 (W.D. Wash. Feb. 23, 2011) (“[CEMA] provides statutory damages of $500 for every email that violates it.”). “Unlike the CPA, CEMA’s $500 penalty does not require a showing of actual damages.” *Brown*, 567 P.3d at 42.

57. Ashley Stewart has violated CEMA by sending Plaintiffs and Class members emails with false or misleading information in the subject lines.

58. As alleged in detail below, Ashley Stewart’s advertised percentage-off discounts and “free” offers are false. In reality, Ashley Stewart advertises perpetual discounts for the products and virtually never offers its products at their advertised reference price. As such, Ashley Stewart’s emails that advertise these false discounts in their subject lines are false and misleading in violation of CEMA. Furthermore, Ashley Stewart sent the false and misleading commercial emails to email addresses that Ashley Stewart knew, or had reason to know, were held by Washington State residents.

### C. **<u>Ashley Stewart Has Transmitted Numerous Commercial Emails With False Or Misleading Subject Lines In Violation Of CEMA.</u>**

59. Ashley Stewart has transmitted numerous commercial emails with false or misleading subject lines to Plaintiffs and other Washington residents in violation of CEMA. (As used in this Complaint, allegations that Ashley Stewart “transmitted” or “sent” an email are


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

allegations that Ashley Stewart initiated the transmission of the email, conspired with another to initiate the transmission of the email, and/or assisted the transmission of the email.)

60. These violative emails have subject lines advertising materially false percentage-off discounts or materially false "free" offers. The majority of these emails are large percentage-off discounts (typically between 40% to 70% off).

61. These email subject lines are materially false or misleading in violation of CEMA and the CPA because the advertised percentage-off discounts are phony and are calculated from inflated and fictitious list prices at which Ashley Stewart never or almost never offered its products.

62. On occasion, Ashley Stewart also sends commercial emails with subject lines advertising "free" offers such as "Buy 1 Get 1 Free" or "BOGO Free." The "free" offers advertised in these email subject lines are materially false or misleading in violation of CEMA and the CPA because Ashley Stewart inflates the first item's selling price (typically at least doubling it from the true regular price) to recover the cost of the "free" item, such that the "free" offer is phony.

63. The "free" offer statements in these email subject lines are false and misleading. Advertised "free" offers such as these are viewed both under the law and by reasonable consumers to mean that the consumer is getting the "free" item(s) at no cost in conjunction with the purchase of the first item at no more than that first item's regular price. However, whenever Ashley Stewart makes such a purported "free" offer, Ashley Stewart inflates the first item's selling price to its never-otherwise-charged list price. Because the item is "discounted" by up to 75% off the list price at all other times, this means Ashley Stewart is directly recovering all of the cost, or even more than the cost, of the "free" item(s) by increasing the price of the first item. The free offer is therefore illusory, and the consumer is not getting any deal at all.

64. The Federal Trade Commission warns sellers advertising "Free" offers that "such offers must be made with extreme care so as to avoid any possibility that consumers will be


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

misled or deceived." 16 C.F.R. § 251.1(a)(2). "[W]hen the purchaser is told that an article is 'Free' to him if another article is purchased, **the word 'Free' indicates that he is paying nothing for that article and no more than the regular price for the other.** Thus, a purchaser has a right to believe that the merchant will not directly and immediately recover, in whole or in part, the cost of the free merchandise or service by marking up the price of the article which must be purchased." 16 C.F.R. § 251.1(b)(1) (emphasis added).

65. Accordingly, it is deceptive for a seller making a "Free" offer to "increase[] his regular price of the article required to be bought." 16 C.F.R § 233.4(b). "Regular price" means "the price, in the same quantity [and] quality, . . . at which the seller or advertiser of the product or service has openly and actively sold the product or service in the geographic market or trade area in which he is making a 'Free' or similar offer in the most recent and regular course of business, for a reasonably substantial period of time, i.e., a 30–day period." 16 C.F.R. § 251.1(b)(2).

### 1. Ashley Stewart Sent Thousands Of Violative Emails To Plaintiffs and the Class.

66. Based on the investigation of Plaintiffs' counsel, Defendants sent Washington State residents like Plaintiffs thousands of violative percentage-off emails. The following is a non-exhaustive list of such emails sent on the date, and containing the email subject line, specified below:

| Date | Email Subject Line |
|---|---|
| 02/16/2026 | You've got plans, we've got 40% off DRESSES 👗 |
| 02/15/2026 | 50% off ALL TOPS & SWEATERS 🔥 |
| 02/14/2026 | The best of blue is 40% off🔵💙 |
| 02/14/2026 | 📢50% OFF ALL TOPS AND SWEATERS |
| 02/13/2026 | ALL NEW: 50% OFF Graphic tees for every mood 🙂 |
| 02/13/2026 | 50% OFF ALL tops and sweaters👚 |


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

| | |
|---|---|
| 02/12/2026 | Thanks, it's NEW! ⭐✨50% OFF TODAY ONLY |
| 01/16/2026 | 😍40% off these new styles! |
| 01/15/2026 | Last Chance 60% off! Hundreds of styles |
| 01/15/2026 | 🚨Today Only: 50% off Shapewear and Lingerie!👙 In-store and online |
| 01/14/2026 | Last chance for 60% OFF! |
| 01/13/2026 | 60% off! 60% off! Hundreds of styles |
| 01/13/2026 | 60% off hundreds of styles |
| 01/12/2026 | NEW NEW NEW! 50% off!🎉 |
| 01/11/2026 | 50% off these new looks?👀 Yes please! |
| 01/05/2026 | 🚨 End of season sale! Up to 80% off in-store and online! |
| 01/04/2026 | 📢Last Day! 50% off Sitewide! |
| 01/03/2026 | Ends Soon! 50% Off Sitewide 🎊 (including NEW) |
| 01/02/2026 | It's still the New Year! Enjoy 50% off Entire Site (including new!)🥳 |
| 01/01/2026 | New year ✓ New looks ✓ More glamour ✓ all at 50% off |
| 12/31/2025 | 🥳HAPPY NEW YEAR! Get 50% off SITEWIDE🎆 |
| 12/30/2025 | Color crush: 60% off Winter white ❄️🤍🐇 |
| 12/30/2025 | NEW IS HERE 🍾 60% off almost everything ends TONIGHT |
| 12/30/2025 | EXTENDED! 60% off almost Everything ends TONIGHT |
| 12/29/2025 | TODAY ONLY🚨60% off almost EVERYTHING |
| 12/28/2025 | Save Up to 80% In-Store & Online! 🎉 |
| 12/24/2025 | 🚨Last chance to get 50% off everything in-store and online!🎄 |
| 12/23/2025 | 🚨Get 50% off everything + new arrivals in-store and online!🎄 |
| 12/22/2025 | The YUMMIEST shade of the season (and 50% OFF)🍰 🤍 🧁 |
| 12/22/2025 | 40% OFF ALL BRAS online❗ |
| 12/22/2025 | On Trend: 50% off Emerald Green 💚🍀✔️ |
| 12/22/2025 | 50% off everything in-store and online! ❄️ |


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

| | |
|---|---|
| 12/21/2025 | RUN🏃‍♀️60% off active ends TONIGHT🚨 |
| 12/21/2025 | ❄Wrap yourself in a SWEATER for 50% off!❄ |
| 12/21/2025 | LAST DAY📢60% OFF ACTIVEWEAR |
| 12/20/2025 | 🎁 Get 50% off your last minute holiday shopping! |
| 12/20/2025 | 🏃‍♀️Running errands? Shop 60% off Active |
| 12/20/2025 | 🚨60% OFF ACTIVE🏃‍♀️ |
| 12/19/2025 | Final hours: 60% off SWEATERS & OUTERWEAR |
| 12/19/2025 | Naughty or Nice 🌶️ 😇 50% off Lingerie! |
| 12/19/2025 | THESE 👋 NEW 👋 PRINTS 👋 50% OFF 😍 |
| 12/19/2025 | 🕘 Time to CLOCK IN: 50% OFF New looks for work and beyond |
| 12/18/2025 | FINAL HOURS ⚠ 60% off SITEWIDE HAPPY HOUR ends TONIGHT |
| 12/18/2025 | HAPPY HOUR🎉60% OFF SITEWIDE (including new arrivals!) ENDS TONIGHT |
| 12/17/2025 | 📢FINAL HOURS! 60% off these holiday styles! 🎄 |
| 12/17/2025 | Printed denim AND 50% off? You've gotta see these new styles 👀 |
| 12/17/2025 | (1) New Arrival Reminder: It's all 50% off! |
| 12/17/2025 | 50% OFF these holiday Matching Sets!🎄 |
| 12/16/2025 | 🎁60% off these styles that are perfect for the holidays! |
| 12/16/2025 | Being cold is NOT an option. 50% off these jackets & coats |
| 12/15/2025 | 50% OFF these Holiday Dresses👗🎄 |
| 12/15/2025 | 🎄60% off these holiday styles! 🎅 |
| 12/14/2025 | LAST DAY! 50% OFF these DRESSES in-store and online👗 |
| 12/13/2025 | 🚨FINAL HOURS: 60% OFF BOTTOMS |
| 12/13/2025 | Current obsession: 50% OFF 💚🌲✔🟢 |
| 12/13/2025 | 📢DAILY DEAL: 60% off BOTTOMS (denim, faux leather & more!) |
| 12/10/2025 | 50% OFF EVERYTHING INCLUDING NEW ARRIVALS☺ |

| | |
|---|---|
| 12/09/2025 | 40% off the sets of the SEASON! |
| 12/09/2025 | ⏳💼DAILY DEAL: 60% OFF PONTE STYLES💼⏳ |
| 12/08/2025 | 40% OFF: Because being cold is NOT an option 🥶 |
| 12/07/2025 | ((50% off ends tonight)) We've got a little black dress for that… 👗🖤 |
| 12/07/2025 | 🚨Final Hours! 50% off NEWNESS 🎄 |
| 12/07/2025 | [50% off] Office-ready... but make it FESTIVE 🎄 |
| 12/06/2025 | 40% OFF SEQUINS✨It's your time to shine! ✨ |
| 12/05/2025 | [60% off sweaters TODAY ONLY]❄️ |
| 12/05/2025 | DAILY DEAL TODAY ONLY⏳ 60% off ALL SWEATERS |
| 12/04/2025 | 🐆Trust your instincts🐆 Shop 40% off these styles |
| 12/04/2025 | ❄️FINAL HOURS: 60% Off the DAILY DEAL🥶 |
| 11/30/2025 | Thanks, it's NEW! 🤩 And it's 60% OFF! |
| 11/29/2025 | Last Day! 🚨 50% off EVERY. SINGLE. NEW. ITEM. |
| 11/29/2025 | It's sooo SHINY (50% OFF SEQUINS)💎✨⭐🤩 |
| 11/29/2025 | In-store and online: 50% Off Every Single Item + $6 panties!!! |
| 11/28/2025 | Trust your animal print instincts 🐅SHOP 50% OFF NEWNESS |
| 11/22/2025 | Feeling fancy? 💅 We've got 50% off dresses 😍 |
| 11/22/2025 | Better Together: 50% off Matching Sets ⛄ 🎁 |
| 11/21/2025 | 60% off the MUST-HAVE styles ❗ |
| 11/20/2025 | Feeling a little bit dramatic ✨50% OFF |
| 11/20/2025 | 50% off everything (including NEW) 🔥 |
| 11/22/2025 | Feeling fancy? 💅 We've got 50% off dresses 😍 |
| 11/16/2025 | 💃 Dresses are 50% OFF right now! |
| 11/15/2025 | Busy? Run errands in STYLE 🏃‍♀️ AND at 50% off! |
| 11/14/2025 | ✨ Holiday Style Starts Here – 50% Off! |
| 11/13/2025 | HOT TAKE 🔥 The coat IS the outfit (+ 50% OFF right now) |



HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

| | |
|---|---|
| 11/04/2025 | Last day! Tops are 50% off! 👚 |
| 11/03/2025 | Is there anything a denim jacket can't do? 💙 Get 40% off! |
| 11/03/2025 | New sweaters? YES, PLEASE! (and 40% off!) |
| 11/01/2025 | Denim report: It's all in the DETAILS 👖 these styles are 40% off! |
| 10/31/2025 | THIS JUST IN! (40% off new arrivals!) |
| 10/28/2025 | We 😍 a matching moment. 40% off!! |
| 10/27/2025 | 🍂60% Off Fall Favorites – Update Your Wardrobe! |
| 10/26/2025 | 2️⃣ x the Denim 👖 2️⃣ x the fun 💙 40% OFF |
| 10/26/2025 | 📢LAST DAY! Grab a DRESS for 50% OFF! 👗 |
| 09/18/2025 | Final Hours! 40% off ALL DRESSES (including NEW) 👗 |
| 09/18/2025 | 📢LAST DAY to get 60% off these fall ready styles🍁 |
| 09/14/2025 | 🛑 ENDS TODAY! 40% OFF SITEWIDE (new arrivals & clearance) |
| 09/13/2025 | 40% off SITEWIDE! (new and clearance) 😍 |
| 09/11/2025 | 🛑 LAST DAY for 50% off select fall styles🍁 |
| 09/10/2025 | 🍁Shop These Fall Styles At 50% Off🍁 |
| 09/09/2025 | 🍂Start the season with 50% off these fall favorites🍁 |
| 08/27/2025 | 🚨TODAY ONLY: 40% off SITEWIDE (new AND clearance) |
| 08/26/2025 | ⏳50% OFF NEW ARRIVALS HAPPY HOUR ENDS TONIGHT ⏳ |
| 08/26/2025 | 🚨HAPPY HOUR: 50% OFF New Arrivals TODAY ONLY |
| 07/10/2025 | 60% off select styles!🎉 |
| 07/06/2025 | Shop 50% off Dresses + 50% off Tops in-store & online 🎉 |
| 07/05/2025 | End of season sale! All these styles are 50% off! |
| 07/04/2025 | END OF SEASON SALE STARTS NOW! 🎉 Up to 80% off! In-stores and online |
| 06/24/2025 | 📢Final Hours! 50% off SITEWIDE ends tonight |
| 06/23/2025 | 50% off DRESSES |

| | |
|---|---|
| 05/29/2025 | 🚨HAPPY HOUR STARTS NOW🚨 70% OFF these styles! |
| 05/14/2025 | 🎇Red White and you sale: 50% OFF!💥 |
| 05/13/2025 | 50% off almost EVERYTHING! 🤩 |
| 02/20/2025 | 🚨HAPPY HOUR: 60% off Dresses (new and clearance)! |
| 01/08/2025 | 🚨Last Day! End of Season Sale In-store and Online! Save up to 80% off! |
| 12/29/2024 | Save Up to 80% In-Store & Online! 🎉 |
| 05/29/2024 | The SUPER sale starts now❗ 60% off dresses, tops, bottoms and more! |
| 03/12/2024 | Happy Hour STARTS NOW! 🎊 50% off SITEWIDE 🎊 Tonight only! |
| 03/10/2024 | ⏰ Time to suit up! 40% off New Arrivals |
| 03/10/2024 | Shop the Easter Dress Edition at 40% Off Today Only! |
| 03/10/2024 | 🚨 LAST CHANCE 🚨 for 50% off shirts AND blouses |
| 03/09/2024 | ✨ 50% off Shirts and Blouses to elevate your closet! ✨ |
| 03/09/2024 | 🌷 Spring Must-Haves Inside! 50% off Shirts + Blouses STARTING TODAY! |
| 03/07/2025 | HAPPY HOUR: 70% off Spring Styles!! |
| 03/05/2024 | "I love your outfit!" 💖 40% off Sitewide + EXTRA 10% Off when you spend $99+ |
| 02/18/2024 | Make a Statement! 40% off sitewide including new maxi dresses! |
| 01/05/2024 | EVERYTHING is 40% OFF right now! |
| 10/02/2023 | Buy More, SAVE up to 50% OFF 🔥 More Outfits, More Savings |
| 09/10/2023 | In-Store & Online: Buy 1 Bra, Get One FREE |
| 08/19/2023 | 💰 SAVE IN STYLE: take up to 40% off workwear |
| 07/29/2023 | SATURDAY SAVINGS 💰 50% off Dresses, Tops, & Bottoms |
| 07/18/2023 | LAST DAY TO CLAIM YOUR FREEBIE! Buy 1 Dress, Get 1 FREE! |
| 07/17/2023 | BUY 1 Dress, Get 1 FREE! |
| 07/09/2023 | ⏰ ONLY A FEW HOURS LEFT! 50% OFF End of Season Savings ENDS TONIGHT! |



HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

| | |
|---|---|
| 06/23/2023 | READY, SET, BOGO FREE! Select Tops & Bottoms |
| 01/01/2023 | HAPPY NEW YEAR 🌴 Take 50% off EVERYTHING* |
| 12/31/2022 | Happy NYE! 🎇 Shop up to 80% OFF the ENTIRE SITE. |
| 12/30/2022 | 🔔 we're ringing in the new year....with UP TO 80% OFF |
| 09/21/2022 | We NEVER do this...⚡FLASH SALE⚡ 50% off Select Styles + EXTRA 50% off Select Clearance |
| 09/16/2022 | The Halloween Boo-tique is open & 40% off! 👻 |
| 09/14/2022 | The NEW DROP Shop. 💯s of new styles are 40% off! |
| 09/13/2022 | New arrivals, CHECK!✔ 40% off, CHECK! ✔ |
| 09/07/2022 | ENDS TONIGHT: 40% OFF (including best sellers 🙂) |
| 09/07/2022 | LISTEN UP 👂 take 40% off NEW + EXTRA 10% off with $100+ purchases (TODAY ONLY!!!) |

67. Plaintiff Garcia, while residing in Washington State, received the violative emails listed above sent by Ashley Stewart since at least August 23, 2025 and through the present day, while residing in Washington State. Plaintiff Kelly, while residing in Washington State, received the violative emails listed above sent by Ashley Stewart since at least 2020 through October 15, 2025.

68. The above violative emails are only a fraction of the total number of such violative emails from Ashley Stewart sent to Washington State residents within the applicable limitations period.

69. The advertised percentage-off discounts in these email subject lines are viewed both under the law and by reasonable consumers to refer to discounts from Ashley Stewart's own regular offering prices for its products. In reality, Ashley Stewart calculated the "xx% Off" statements from fictitious list prices at which Ashley Stewart never or almost never offered its products. Meanwhile, there was no qualifier or other indicator in the subject line to notify the

email recipients that Ashley Stewart had assigned these words and symbols an invented or unusual subjective meaning rather than their ordinary or objective meaning.

70. As of the date of the filing of the original Complaint in this action, Plaintiff Kelly was still receiving Ashley Stewart's commercial emails. After the filing of the original Complaint in this action, Plaintiff Kelly stopped receiving emails by Ashley Stewart. Plaintiff Kelly would like to resume receiving Ashley Stewart's commercial emails, provided that the subject lines of the emails do not contain false or misleading information.

71. As of the date of the filing of this First Amended Class Action Complaint, Plaintiff Garcia is still receiving Ashley Stewart's commercial emails. Plaintiff Garcia would like to continue receiving Ashley Stewart's commercial emails, provided that the subject lines of the emails do not contain false or misleading information.

### D. Ashley Stewart Sent Commercial Emails To Consumers Whom It Knew, Or Had Reason To Know, Resided In Washington State.

72. Ashley Stewart sent the false and misleading commercial emails to email addresses that Ashley Stewart knew, or had reason to know, were held by Washington State residents (i.e., Plaintiffs and members of the Class), because Ashley Stewart had a physical Washington State address that was associated with the recipient and/or Ashley Stewart had access to data regarding the recipient indicating that they were in Washington State. Ashley Stewart knew or should have known that Plaintiffs and the members of the Class were residents of Washington State.

73. Ashley Stewart knows where the overwhelming majority of the recipients of its commercial emails reside because nearly all of the recipients have previously purchased products from Ashley Stewart and have previously provided their mailing address to Ashley Stewart.

74. First, whenever a person places an order through the Ashley Stewart website, Ashley Stewart associates that email address with a shipping address and billing address for that order.

75. Second, Ashley Stewart encourages its customers to create online accounts. Customers save their contact information in their Ashley Stewart accounts, including their email address, shipping address, billing address, and phone number.

76. Discovery will show that, at the time Ashley Stewart sent the commercial emails to the members of the Class, Ashley Stewart had the physical address for virtually every consumer to whom it sent commercial emails.[6]

## CLASS ALLEGATIONS

77. Plaintiffs bring this lawsuit on behalf of themselves and the members of the following Washington State class (the "Class"):

> **All residents of Washington State who, within the applicable limitations period, received an email from or at the behest of Defendants that contained in the subject line: (a) a "xx% Off" or similar percentage-off statement and/or (b) a statement advertising a "free" offer.**

78. Specifically excluded from the Class are the Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, Defendants' agents and employees and attorneys, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family. Plaintiffs reserve

[6] Ashley Stewart also has other methods by which it could have determined whether the consumers to whom it sent the violative emails resided in Washington. Discovery will show that Ashley Stewart employs methods to track the effectiveness of its marketing emails and to identify consumers who click on links contained in Ashley Stewart's marketing emails, including by identifying their physical location. Discovery will also show that Ashley Stewart utilizes online tracking technologies to identify and locate the consumers who click on links contained in Ashley Stewart's marketing emails and that visit the Ashley Stewart website. Ashley Stewart could have used the information obtained through these online tracking technologies to identify which consumers are in Washington.
Additionally, Ashley Stewart knew, or had reason to know, that the email addresses were held by Washington residents because this information was available to Ashley Stewart upon request from the registrant of the internet domain name contained in each recipient's email address. *See* RCW 19.190.020(2). Ashley Stewart also knew or had reason to know that it sent emails to Washington residents due to its large presence in the state and the volume of marketing emails it sends to people around the country. *See State v. Heckel*, 122 Wash. App. 60, 69 (2004) (holding as a matter of law that a defendant had a reason to know that he sent emails to Washington residents by sending over 100,000 emails a week to people around the country).


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

the right to amend the definition of the proposed Class (and/or subclass) based on factors including discovery, legal developments, and/or corporate structure.

79. **Numerosity.** The number of members of the Class are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of Class members prior to discovery. However, based on information and belief, the Class comprises thousands of individuals. The exact number and identities of Class members are contained in Ashley Stewart's records and can be easily ascertained from those records.

80. **Commonality and Predominance.** This action involves multiple common legal or factual questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over any questions affecting individual Class members, if any. These common questions include, but are not limited to, the following:

a. Whether Defendants sent commercial emails with false or misleading information in the subject lines;

b. Whether Defendants initiated the transmission or conspired to initiate the transmission of such commercial emails to recipients residing in Washington State;

c. Whether Defendants should be ordered to pay statutory damages to Plaintiffs and Class members; and/or

d. Whether Defendants should be enjoined from further engaging in the misconduct alleged herein.

81. **Typicality.** Plaintiffs' claims are typical of Class members' claims. Defendants transmitted, conspired to transmit, or assisted to transmit emails with false or misleading information in the subject line to Plaintiffs and to each Class member. Plaintiffs and Class members all bring the same claims and face the same potential defenses.

82. **Adequacy.** Plaintiffs and their counsel will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests and are


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

committed to representing the best interests of the Class members. Moreover, Plaintiffs have retained counsel with considerable experience and success in prosecuting complex class action and consumer protection cases.

83. **Superiority.** A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Each Class member's interests are small compared to the burden and expense required to litigate each of his or her claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Defendants' conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system. Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial.

84. By its conduct and omissions alleged herein, Defendants have acted and refused to act on grounds that apply generally to the Class members, such that final injunctive relief and/or declaratory relief is appropriate respecting the Class as a whole.

85. Defendants are primarily engaged in the business of selling goods. Each cause of action asserted by Plaintiffs against Defendants in this Complaint arises out of and is limited to communications related to Defendants' sale of goods.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT RCW CHAPTER 19.86

86. Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

87. Plaintiffs plead this count in three separate capacities: in their individual capacity, as private attorneys general, and as proposed class representatives.

88. The Washington Consumer Protection Act (the "CPA"), RCW 19.86, is Washington's principal consumer protection statute. The CPA's primary substantive provision declares unfair methods of competition and unfair or deceptive acts or practices to be unlawful. RCW 19.86.020.

89. The CPA recognizes and incorporates per se violations. "Per se CPA violations are predicated on the Legislature's recognition that certain conduct is categorically against the public interest." *Brown*, 567 P.3d at 46 (citation omitted). The Washington Legislature routinely prohibits certain specified conduct but, instead of, or in addition to, creating a new and independent private right of action to enforce the prohibition, the Legislature deems the unlawful conduct to be a *per se* violation of the CPA.

90. If a defendant engages in that unlawful conduct, a plaintiff may file a CPA complaint alleging the *per se* violation and seek the remedies available under the CPA and/or the remedies available under the statute which forbids the *per se* violation. *See* Washington Pattern Jury Instruction Civil No. 310.03 (*Per Se* Violation of Consumer Protection Act) and Appendix H (Consumer Protection Act *Per Se* Violations).

91. A plaintiff can plead a violation of the CPA by pleading that the CPA was violated per se due to a violation of the Washington Commercial Electronic Mail Act ("CEMA"). *See Brown*, 567 P.3d at 42 ("A violation of CEMA's e-mail regulations is a per se violation of the Consumer Protection Act (CPA)."); *see also* RCW 19.190.030(1)(b) ("It is a violation of the consumer protection act, chapter 19.86 RCW . . . to initiate the transmission of a commercial electronic mail message that . . . [c]ontains false or misleading information in the subject line.").

92. CEMA prohibits a person from initiating the transmission to an email address that the sender knows or has reason to know is held by a Washington State resident of a commercial


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

email that contains false or misleading information in the email's subject line. RCW 19.190.020(1)(b). The Washington Supreme Court has held that this includes subject lines with **any** false or misleading information. *Brown*, 567 P.3d at 47 ("[CEMA] prohibits sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails." (emphasis in original)).

93. "CEMA was enacted to protect concrete interests in being free from deceptive commercial e-mails. CEMA's prohibition on sending commercial e-mails with false or misleading subject lines . . . creates a substantive right to be free from deceptive commercial e-mails." *Harbers*, 415 F. Supp. 3d at 1011 (holding that the plaintiff sufficiently pleaded a concrete injury-in-fact for alleged CEMA violations based on her receipt of marketing emails from defendant containing allegedly false "xx% off" statements in the subject line).

94. Under CEMA, it is irrelevant whether the commercial emails were solicited. *Harbers*, 415 F. Supp. 3d at 1011.

95. Generally, a plaintiff pleading a claim under the CPA must plead five necessary elements: (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that affects the public interest, (4) injury to plaintiff's business and property, and (5) causation. *Wright*, 406 P.3d at 1153 (citation omitted). **Because Plaintiffs allege a per se CPA violation by alleging a CEMA violation, all of these five elements are satisfied as a matter of law**. *Id.* at 724; *see also Brown*, 567 P.3d at 42.

96. "Under CEMA, the injury is receiving an e-mail that violates its regulations." *Brow*n, 567 P.3d at 42. Accordingly, "**CEMA does not require a showing of injury for statutory damages to be awarded because the injury is receiving the e-mail that violates CEMA**." *Id.* at 45*; see also Wright*, 406 P.3d at 1154 ("[CEMA] does not condition the award of damages on proving either injury or causation. In fact, damages for CEMA violations are *automatic*." (emphasis in original)).


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

97. A plaintiff who successfully pleads and proves a CEMA violation as a per se violation of the CPA may recover the remedies which the plaintiff chooses to seek that are available under the CPA (e.g., injunctive relief, treble damages, attorneys' fees and costs (RCW 19.86.090)) and/or the remedies available under CEMA (e.g., statutory damages of $500 per email sent in violation of CEMA and injunctive relief (RCW 19.190.040; RCW 19.190.090)).

98. "**Unlike the CPA, CEMA's $500 penalty does not require a showing of actual damages.**" *Brown*, 567 P.3d at 42. A person is entitled to $500 statutory damages "anytime a prohibited message is transmitted." *Harbers*, 415 F. Supp. 3d at 1009; *see also In re Classmates.com Consol. Litig.*, 2011 WL 744664, at *7 ("[CEMA] provides statutory damages of $500 for every email that violates it.").

99. Defendants are "persons" within the meaning of CEMA. RCW 19.190.010(11).

100. Defendants have initiated the transmission, conspired with another to initiate the transmission, and/or assisted the transmission of numerous commercial emails with subject lines containing false or misleading information to Plaintiffs and the Class. RCW 19.190.030(1)(b).

101. The subject lines of Ashley Stewart's emails contained materially false or misleading information.

102. The false or misleading information in the subject lines of Ashley Stewart's emails was intended to, or had the capacity to, deceive a substantial portion of the public.

103. The emails were electronic mail messages, in that they were emails sent to an email address; the emails also referred to an internet domain, whether or not displayed, to which an email can or could be sent or delivered. RCW 19.190.010(5).

104. The emails were "commercial electronic mail messages," in that they were sent for the purpose of promoting goods or services for sale or lease. RCW 19.190.010(2).

105. Ashley Stewart was the original sender of the emails.


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

106. Plaintiffs and the Class members each received the emails at their electronic mail addresses, which are the destinations, commonly expressed as a string of characters, at which they receive and to which electronic mail may be sent or delivered. RCW 19.190.010(4).

107. Ashley Stewart initiated the transmission, conspired with another to initiate the transmission, and/or assisted the transmission of the emails to one or more email addresses that Ashley Stewart knew, or had reason to know, was held by a Washington State resident, i.e., Plaintiffs and members of the Class.

108. At all relevant times, Defendants knew, or had reason to know, that the intended recipients (Plaintiffs and members of the Class) were residents of the State of Washington because, without limitation: (1) Defendants possessed actual knowledge of Plaintiffs' and each Class member's state of residence; (2) Defendants possessed constructive knowledge of Plaintiffs' and each Class member's state of residence; (3) information was available to Defendants upon request from the registrant of the internet domain name contained in each recipient's email address; and/or (4) Defendants otherwise knew or should have known or had reason to know that Plaintiffs and the members of the Class were residents of the State of Washington.

109. For example, without limitation, Defendants knew or had reason to know that they sent emails to Washington residents because the vast majority of consumers who received its commercial emails had provided Ashley Stewart with their shipping address and billing address when they placed an order on Ashley Stewart and/or when they created an online account.

110. Defendants engaged in a pattern and practice of violating CEMA. As a result of Defendants' acts and omissions, Plaintiffs and Class members are entitled to $500 in statutory damages for each and every email that violated CEMA that was transmitted to them. Plaintiffs and Class members are also entitled to recover actual damages, treble damages, and attorneys' fees and costs, pursuant to RCW 19.86.090.


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

111. Treble damages are appropriate under these circumstances because, without limitation, Ashley Stewart's misconduct has been "an ongoing course of conduct affecting thousands of consumers" and thus has a "strong public interest impact." *See Matheny v. Unumprovident Corp.*, 594 F. Supp. 2d 1212, 1225 (E.D. Wash. 2009).

112. **Permanent public injunctive relief.** Plaintiffs, acting as private attorneys general, seeks public injunctive relief under the CPA to protect the general public from Ashley Stewart's misconduct.

113. The Washington Supreme Court treats consumers as "private attorneys general," and has held that consumers' ability to enjoin unlawful conduct is a primary purpose of the CPA:

> Private actions by private citizens are … an integral part of CPA enforcement. . . . **Private citizens act as private attorneys general** in protecting the public's interest against unfair and deceptive acts and practices in trade and commerce. . . . **Consumers bringing actions under the CPA do not merely vindicate their own rights; they represent the public interest and may seek injunctive relief even when the injunction would not directly affect their own private interests.**

*Scott v. Cingular Wireless*, 160 Wash. 2d 843, 161 P.3d 1000, 1006 (2007) (emphasis added) (citations omitted).

114. This type of injunctive relief has been referred to as "public injunctive relief." *See McGill v. Citibank, N.A.*, 393 P.3d 85, 90 (Cal. 2017) ("[P]ublic injunctive relief … is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public.") (quoting *Broughton v. Cigna Healthplans of Cal.*, 988 P.2d 67, 74 (Cal. 1999)). The *Broughton v. Cigna Healthplans of California* court likewise referred to consumers seeking public injunctive relief as "private attorney[s] general." *See Broughton*, 988 P.2d at 74.

115. A consumer may seek injunctive relief to protect the public even if the requested relief would not directly benefit him or her. *See Hockley v. Hargitt*, 510 P.2d 1123, 1132–33 (Wash. 1973).


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

116. Defendants' misconduct, which affects and harms the general public, is ongoing in part or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-occurrence by Defendants absent a permanent public injunction. Accordingly, Plaintiffs seek an order enjoining Defendants from committing the unlawful conduct alleged herein.

117. The balance of the equities favors the entry of permanent public injunctive relief against Defendants. Plaintiffs, the members of the Class, honest competing businesses, and the general public will be irreparably harmed from Defendants' ongoing misconduct absent the entry of permanent public injunctive relief against Ashley Stewart.

118. Plaintiffs lack an adequate remedy at law to prevent Defendants from engaging in the unlawful conduct alleged herein. Plaintiff Garcia continues to receive commercial emails from Ashley Stewart, and she wants to continue receiving commercial emails from Ashley Stewart in the future, provided that the subject lines of the emails do not contain false or misleading information. Plaintiff Garcia will be harmed if, in the future, she receives commercial emails from Ashley Stewart that have false or misleading information in their subject lines.

119. Monetary damages are not an adequate remedy at law for <u>future</u> harm. *Clark v. Eddie Bauer LLC*, No. 21-35334, 2024 WL 177755, at *3 (9th Cir. Jan. 17, 2024). Monetary damages are inadequate for future harm for the following reasons, without limitation: First, damages are not an adequate remedy for future harm because they will not prevent Defendants from engaging in their unlawful conduct. Second, damages for future harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know how many violative emails Defendants will send Plaintiff Garcia in the future. Third, injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful conduct, the courts may be flooded with future lawsuits by Class members, Plaintiff Garcia, and the general public for future violations of the law by Defendants.

## COUNT II

## VIOLATION OF THE WASHINGTON CONSUMER ELECTRONIC MAIL ACT RCW CHAPTER 19.190

120. Plaintiffs reallege and incorporate by reference all paragraphs alleged hereinabove.

121. Plaintiffs plead this count in three separate capacities: in their individual capacities, as private attorneys general, and as proposed class representatives.

122. CEMA, RCW 19.190, creates an independent private of right of action which can be asserted by, among others, a person who is the recipient of a commercial electronic mail message which contains false or misleading information in the subject line. RCW 19.190.030(1)(b). A plaintiff who successfully alleges and proves such a violation may obtain, among other things, an injunction against the person who initiated the transmission. RCW 19.190.090(1). It is Plaintiffs' intent in this count to plead an independent CEMA cause of action only to the extent that it is recognized by law, e.g., when a plaintiff seeks injunctive relief. *Wright*, 306 P.3d at 1153 n.3("[W]e note that a plaintiff may bring an action to enjoin any CEMA violation."); *Gragg v. Orange Cab Co.,* 145 F. Supp. 3d 1046, 1052 (W.D. Wash. 2015).

123. Defendants have violated CEMA on the grounds alleged in Count I above.

124. For the reasons alleged in Count I, Plaintiffs seek, and may obtain, a permanent public injunction against Defendants.

## PRAYER FOR RELIEF

A. Plaintiffs Teresa Kelly and Rochelle Garcia, on behalf of themselves and the proposed Class, request that the Court order relief and enter judgment against Defendant Ashley Stewart, Inc., Defendant Kinbow LLC, Defendant G Ashley, Defendant Samarth Gupta, and Defendant Sarika Gupta as follows:

1. Declare this action to be a proper class action, certify the proposed Class, and appoint Plaintiffs and their counsel to represent the Class;


HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

2. Declare that Defendants' conduct alleged herein violates the CPA and CEMA;

3. Order Defendants to pay Plaintiffs and each member of the Class statutory damages of $500 for each and every commercial email that Defendants transmitted to them that contained false or misleading information in the subject line in violation of CEMA pursuant to, without limitation, RCW 19.190.020(1)(b), RCW 19.190.030(1)(b), RCW 19.190.040(1);

4. Order Defendants to pay treble damages pursuant to RCW 19.86.090;

5. Permanently enjoin Defendants from engaging in the unlawful conduct alleged herein, pursuant to, without limitation, RCW 19.86.090; RCW 19.190.090(1);

6. Retain jurisdiction to monitor Defendants' compliance with the permanent injunctive relief;

7. Order any other equitable relief the Court deems proper;

8. Order Defendants to pay attorneys' fees, costs, and pre-judgment and post-judgment interest to the extent allowed by law; and

9. Grant such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted on February 27, 2026, by:



HATTIS LUKACS & CORRINGTON
11711 SE 8TH ST, STE 120, BELLEVUE, WA 98005
TEL: 425.233.8650; FAX: 425.412.7171
www.hattislaw.com

*/s/ Daniel M. Hattis*
Daniel M. Hattis, WSBA No. 50428
dan@hattislaw.com
Che Corrington, WSBA No. 54241
che@hattislaw.com
HATTIS LAW
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
Tel: 425.233.8650
Fax: 425.412.7171

Roger N. Heller (*Pro Hac Vice*)
rheller@lchb.com
Daniel Hutchinson (*Pro Hac Vice*)
dhutchinson@lchb.com
John D. Maher (*Pro Hac Vice*)
jmaher@lchb.com
Courtney J. Liss (*Pro Hac Vice*)
cliss@lchb.com
Sara B. Evall (*Pro Hac Vice*)
sevall@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street,
29th Floor San Francisco,
CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

*Attorneys for Plaintiffs and the Proposed Class*